**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SPHERENOMICS GLOBAL CONTACT
CENTERS,

                           Plaintiff,

          - against -

VCUSTOMER CORPORATION,

                          Defendant.
------------------------------------------------------------X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

CV 03-1682 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiff Spherenomics Global Contact Centers ("Spherenomics") has filed a complaint

alleging four causes of action against defendant vCustomer Corporation ("VCC"). Its two

contract-based causes of action assert that VCC breached an agreement dated November 25,

2002, by violating, respectively, a provision barring VCC from soliciting business from

Spherenomics' customer (Count One) and the implied covenant of good faith and fair dealing

(Count Two); its remaining counts assert equitable claims based on theories of promissory

estoppel (Count Three) and unjust enrichment (Count Four). Docket Entry ("DE") 66

("Amended Complaint"). With the parties' consent pursuant to 28 U.S.C. § 636(c), I presided

over a non-jury trial of these claims on August 1, 2005. Upon review of all the evidence and the

parties' post-trial submissions, I now find that VCC had an enforceable obligation not to solicit

Spherenomics' customer Fingerhut and that VCC breached that obligation but that Spherenomics

has failed to prove by a preponderance of the evidence that it was damaged by VCC's breach. As

a result, for the reasons set forth below, VCC is entitled to judgment in its favor on all of

Spherenomics' claims.

I.      Findings of Fact

        A.      The Entities

        Spherenomics provides outsourced call-center services to retail and direct marketing companies primarily through call centers in India.  Transcript Of Trial ("Tr.") at 15-16.  During the relevant time period, Spherenomics did not own any call centers; rather, it acted as a middleman between merchants and the call centers it engaged as subcontractors.  Tr. 99.  Spherenomics did provide training to call center agents about its clients' brands, services, policies and procedures.  Ex. 6.  Spherenomics was formed in 2002 as a partnership among Ralph Bulle ("Bulle"), Richard Hoffman ("Hoffman"), and Rakesh Kaul ("Kaul").  These three partners were its only employees at that time.  Tr. 64-66.  In October 2002 Spherenomics secured its first major customer, non-party Fingerhut Direct Marketing, Inc. ("Fingerhut"), a general merchandise catalog and Internet retailer.  Stipulated Fact ("Stip.") 4, 7.  Both Hoffman and Kaul had formerly worked for Fingerhut and anticipated a long-term, symbiotic business relationship between the two companies.  Tr. 17-18.

        VCC is a United States company that owns and operates three call centers in New Delhi, India.  Stip. 1.  Operators at these centers answer customer service calls and order requests for some of the largest retailers in the United States.  Stip. 2.

        Non-party Tracmail is another call center service provider that owns and operates call centers in Bombay, India.  Call center operators at both VCC and Tracmail take incoming calls and also place outgoing calls to customers.  The former are known as retail inbound calls, and are typically requests for catalogs or inquiries about statements.  The latter are typically follow-up or collection calls concerning overdue payments.  Bulle testified on direct examination that in late

2002, Tracmail and VCC were the only two call centers in India with experience handling retail inbound calls. Tr. 23. VCC sought to undermine that proposition in its cross-examination of Bulle but did not produce any evidence that rebuts Bulle's contention. *See* Tr. 74-77.

      B.    <u>The Initial Fingerhut Call Center Service Account</u>

            1.    <u>The Letter Agreement Between Spherenomics And Fingerhut</u>

The dispute in this case has its origin in Fingerhut's change of ownership and the temporary shutdown of its retail business during the transition. Fingerhut's former owner ceased doing retail business for several months starting in the Fall of 2001. Tr. 16. Early in 2002, in anticipation of the company's return to retail sales, Fingerhut and Spherenomics discussed entering into a joint venture. Spherenomics provided substantial assistance to Fingerhut during this period leading up to the re-launch of Fingerhut's retail business. Spherenomics was not compensated for its efforts, but its members (who had a long-standing relationship with Fingerhut) anticipated that their work would pay off in a long-term contract for Fingerhut's call center work. Tr. 20, 27. Fingerhut's new owners ultimately re-launched the retail business in the Fall of 2002; and prospective customers first received its new catalogs in November of that year. Tr. 26.

Fingerhut officially retained Spherenomics on October 4, 2002, to provide call center services through January 31, 2003. Trial Exhibit ("Ex.") 6. The terms of the relationship were memorialized in a "Letter Agreement" that specified in great detail the nature, time frame, and cost of the services to be provided. *Id.* The cost of services was based on the average monthly number of full time equivalent ("FTE") call center workers. Depending on the number of workers, the rate varied from $13.25 to $14.75 per active hour. This was the only cost to

Fingerhut of Spherenomics' services.  *Id.* at 5.  Fingerhut agreed to provide Spherenomics with monthly volume projections estimating the number of FTEs it would require for each month, and the parties agreed on a minimum staffing schedule for the initial period for which Fingerhut assumed payment responsibility.  In recognition of the "uncertainty in the volume and staffing projections," Spherenomics agreed to "make a good faith effort to have available" an additional 15% capacity for which Fingerhut would not be charged unless the reserve services were used.  *Id*. at 1-2.  The parties agreed to "negotiate in good faith" regarding a successor agreement to supersede the October 2002 letter agreement.  At the time of the Letter Agreement, the parties to it anticipated that a subsequent agreement would extend the parties' relationship through May 1, 2004.  *Id*. at 8.  Fingerhut and Spherenomics never entered into a subsequent agreement, and their contractual relationship ended on December 31, 2003.  Ex. 15.

Spherenomics initially hired Tracmail to provide the actual call center services for the Fingerhut account.  After several weeks of training, Tracmail began to take calls for Fingerhut on November 9, 2002.  Tr. 24.  Almost immediately, call volume exceeded Fingerhut's projections by a factor of ten.  Tr. 24-25.  Despite the 15% buffer Tracmail provided pursuant to the Letter Agreement, and an additional 25% buffer that Tracmail independently provided, Tracmail simply did not have the capacity to handle all of the calls.  Tr. 24, 26-27, 85.

2.    The November Agreement Between Spherenomics And VCC

Once it became clear that Tracmail could not service all of Fingerhut's calls, Spherenomics began to look for additional call center service providers.  It was essential to Spherenomics that it quickly find a provider that could absorb the unanticipated call volume of its only customer.  Tr. 85.  Spherenomics was familiar with VCC's services from prior

discussions concerning a possible joint venture. Tr. 27. Spherenomics also knew that VCC had agents trained in retail calls who were immediately available because one of VCC's retail customers was underperforming. Tr. 28. After Bulle and VCC Senior Vice President Howard Lee ("Lee") discussed the possibility of VCC absorbing Fingerhut's excess call volume, Spherenomics obtained authorization from Fingerhut to add VCC as a provider. Tr. 28, 119; Ex. 36. Lee initially proposed a one-year contract for the services of 500 agents, Ex. 4, but the parties ultimately adopted a much more limited agreement.

The parties entered into that agreement by means of a writing dated November 25, 2002. Ex. 1 (the "November Agreement"). Pursuant to the November Agreement, VCC agreed to provide agents to cover 25 seats from November 29 through December 21, 2002, at the rate of $10.50 per hour. *Id.* The parties twice agreed to extend the term of the November Agreement: on December 19, 2002, they extended its term through January 10, 2003, Ex. 28, and they subsequently extended the term through January 31, 2003, Ex. 35.

At the heart of the instant dispute is the following provision, which appeared under the caption "Non-Disclosure and No Solicitation Agreement" in the November Agreement:

> VCC agrees to sign a mutually agreeable non-disclosure and no solicitation agreement with Spherenomics limited to Fingerhut. VCC agrees not to solicit or other provide call center services for Fingerhut for 24 months following the end of VCC services for this Spherenomics client.

Ex. 1 at 2 (the "No Solicitation Provision"). A separate provision specified that all communication about the Fingerhut business, including performance reporting and billing, was to be made through Spherenomics. *Id.*

As was his personal practice and an industry norm, Bulle sent a copy of Spherenomics' standard three-page Non-Disclosure Agreement ("NDA") to VCC when he first approached the company about servicing the Fingerhut account.  Tr. 92, 95.  The need for such a protective agreement was plain:  as Bulle testified (in explaining why even in advance of sending out the NDA, he had insisted on the No Solicitation Provision in the November Agreement),  "[VCC] was in fact a potentially very serious competitor of ours.  They were engaged in the same client work.  And through engaging them as a [subcontractor], if you will, we were letting the fox in the hen house, if you will."  Tr. 34.  That risk was heightened by the fact that VCC was at the time saddled with more trained call center agents on its payroll than it needed to serve another customer whose call volume was below what VCC had expected.  Tr. 27-28.

Unfortunately for Spherenomics, it was not able to prove that VCC ever executed the NDA.  When the parties subsequently entered into discussions concerning a joint bid with Tracmail for a long-term Fingerhut contract, Bulle sent Lee another NDA for him to sign.  Tr. 95. Lee apparently never signed that agreement either, despite Bulle's request that he do so.  Tr. 92.  I note in this regard that the record is somewhat murky on this issue:  Bulle does not have a clear recollection, but believes he would normally have required VCC to execute the NDA; on the other hand, he was unable to find an executed copy.  Thus, although it is entirely possible that the parties did in fact enter into an NDA that superseded the November Agreement, on this record I am constrained to conclude that they did not.

Spherenomics' standard NDA outlines in great detail the obligations of each party with respect to confidential information and "trade secrets" that the parties would necessarily have to disclose to each other in the course of their joint activities.  Ex. 37 ¶ 1.  For example, the NDA

specified that the name of any client or supplier introduced to one party by another "for the purposes of jointly pursuing additional business" would be considered "confidential information" and, in a provision that substantially mirrors that in the November Agreement, prohibited that party from "unilaterally conduct[ing] any business with such clients or suppliers for a period of two years from the date of this agreement without the written agreement of the Disclosing Party." *Id.* ¶ 2.  Unlike the November Agreement, however, the unexecuted NDA also contained a lengthy provision setting forth explicit remedies for breach – the first clause of which contains a decidedly prescient description of Spherenomics' current predicament:

> _____ [a blank to be filled in with VCC's name] and [Spherenomics] hereby acknowledge and agree that the extent of damages to the other party in the event of a breach of the covenants contained in this Agreement by the breaching party would be difficult or impossible to ascertain and that there is and will be available to the Disclosing Party no adequate remedy at law in the event of any such breach.  Consequently, the breaching party agrees that in the event of such breach, the nonbreaching party shall be entitled, in addition to any other remedies it may have at law, to enforce any or all of the covenants contained in this Agreement by an injunction or other equitable relief.

Ex. 37 ¶ 10.  In contrast, the No Solicitation Provision of the November Agreement – that is, the relevant provision in the only written agreement that the parties in this case actually executed – is silent with regard to the parties' anticipated remedies in the event of a breach.  Ex. 1 at 2.

    C.    <u>Spherenomics' Pursuit Of A Long-Term Account With Fingerhut</u>

    1.    <u>Smith's Attempt To Eliminate The Middleman</u>

In early December 2002, Fingerhut appointed a new president Brian Smith ("Smith").  Spherenomics' partners had no pre-existing relationship with Smith, as they had had with his predecessors.  Tr. 38.  The consequences of that difference quickly became apparent:  Smith's relations with Spherenomics were strained from the inception of his tenure.  On December 5,

2002, Spherenomics' Bulle and Hoffman met with Smith for the first time in Minnesota. At that meeting, Smith told the Spherenomics executives that Fingerhut intended to consider other alternatives besides Spherenomics for its long-term call service business. Tr. 39. Smith invited Spherenomics to participate in a bidding process through which it would select the providers. *Id*. Smith also asked Bulle and Hoffman about Spherenomics' relationships with its subcontractors Tracmail and VCC. *Id.* Bulle relayed that Spherenomics had an exclusive right to represent Tracmail and VCC. Tr. 39. Three days later, Smith called Hoffman in an agitated, angered state and demanded that Spherenomics release VCC and Tracmail from the no-solicitation agreements. Tr. 44-45. Smith threatened that if Spherenomics did not do so it would never work for Fingerhut again, and then hung up on Hoffman. Tr. 121. Thereafter, Smith refused to take or return Hoffman's phone calls and other Fingerhut executives were similarly non-responsive. *Id*. Even Don Lynch, a Fingerhut official for whom Hoffman had previously worked and with whom he had a close relationship, was unable to help Bulle and Hoffman mend fences with Smith. Tr. 125-126.

Later that month, Lee asked Spherenomics' executives if they would allow VCC to buy itself out of what Bulle called in his testimony "the noncircumvent restriction" (apparently a reference to the No Solicitation Provision of the November Agreement). Tr. 42. Lee told Bulle and Hoffman that VCC's Chief Executive Officer Sanjay Kumar had a history of violating written agreements. Tr. 42-43; Deposition of Howard Lee dated July 8, 2004 ("Lee Dep.") at 34, 150. Bulle rejected VCC's overture, and reminded Lee of the "noncircumvent agreement." Tr. 43.

In late 2002, Fingerhut executives toured approximately nine separate call centers in India in connection with its solicitation of bids for its long-term call center work. Stip. 16. According to Fingerhut's Director of Call Center Operations Carmen Coyle ("Coyle"), Fingerhut was at that time hoping to expand its business and sought to hire two separate call center providers to create a "champion-challenger" environment that would foster competition among providers and allow for seamless service in the event of service interruption at one site. Deposition of Carmen Coyle dated August 9, 2004 ("Coyle Dep.")) 15; Tr. Ex. 8. Prior to the trip, Spherenomics had offered to help Fingerhut vet potential providers. Coyle declined the offer. Tr. 97. Spherenomics did plan and orchestrate Fingerhut's visits to the VCC and Tracmail call centers. Tr. 45. On December 24, 2002, Spherenomics and Tracmail made a presentation for Smith and Coyle at which Coyle complimented Tracmail on its work to date. Tr. 46-47.

While in Bombay, Smith requested a private meeting with Tracmail executive Adi Cooper ("Cooper"), and with Spherenomics' approval, Cooper had a dinner meeting with Smith and his wife. *Id.* During this meeting, Smith asked Cooper if he would bid separately or independently of Spherenomics for Fingerhut's business. Cooper told Smith that it would only bid jointly with Spherenomics. Tr. 47. Approximately ten days later, the Spherenomics and VCC management teams made a similar presentation for Fingerhut executives at VCC's call center in New Delhi. *Id.* During a break in the presentation, Smith asked Lee if he would bid independently of Spherenomics. *Id.* Despite the clear message from Spherenomics that it would not release VCC from the noncircumvent provision, when Smith asked Lee whether VCC could proceed without Spherenomics, Lee suggested that they would be able to work out an agreement with Spherenomics. Lee Dep. at 51-52. When Lee relayed Smith's inquiry to Bulle, Bulle

reminded Lee of the noncircumvent agreement, and Lee agreed to submit a joint proposal with Spherenomics and Tracmail for the Fingerhut account. Tr. 47.

On December 31, 2002, Fingerhut formally notified Spherenomics that it would allow the Letter Agreement to lapse on January 31, 2003 rather than extending it or replacing it with a successor agreement. Stip. 13; Ex. 15. Smith wrote that Fingerhut was "engaged in the process of evaluating a number of options . . . for addressing its call center needs" and further asserted that "[i]t is our hope that Spherenomics will participate fully as a candidate who may provide a portion of our service requirements." Ex. 15. I find the latter statement to be false. The proposition that Smith wanted Spherenomics to participate in the bidding process is wholly inconsistent with the statements and conduct attributed to him and others at Fingerhut in testimony by Bulle that I found credible. Moreover, it is an entirely reasonable inference (and one that I draw) that Smith expressed his hope that Spherenomics would submit a bid as a ruse intended to pave the way for VCC to make a bid on its own without either alerting Spherenomics to that fact or undermining its position in any later legal dispute.

2.    Spherenomics' Joint Bid With Tracmail And VCC

In early January, VCC, Spherenomics, and Tracmail began work on a joint bid for the long-term Fingerhut contract. Tr. 52-53. Although Fingerhut had experienced some problems with Tracmail such as service disruption, which it had discussed with Spherenomics, Spherenomics identified Tracmail as the primary provider in the joint proposal. Tr. 84-85; Coyle Dep. at 104-105. The parties submitted their jointly-developed written proposal to Fingerhut on January 20, 2003. Ex. 8. The proposed pricing schedule was based on active agent hours. *Id.*, Term Sheet at 1. Fingerhut would be billed for each active agent at a rate that varied according

to the total number of FTE agents.  *Id.*  The hourly rate ranged from $10.50 for an FTE count of 801 or more to $12.90 for an FTE count of 25 to 100.  *Id.*  Spherenomics' share of the net revenue from the Fingerhut account was to be 20% for the first year, 18% in the second year, and 15% in the third year.  Ex. 22, Ex. D.  The term of the proposed contract was 24 months.  Ex. 8, Term Sheet at 3.  Lee and Smith also made a verbal presentation of the proposal to Fingerhut executives in late January 2002.  Tr. 53.  A few days after the presentation, Coyle informed Spherenomics that the bid had been rejected.  Tr. 109.

### 3.    VCC's Independent Bid

On January 31, 2003, Lee informed Hoffman that VCC intended to solicit Fingerhut directly and independently.  This was the first time that Spherenomics learned that VCC intended to submit an independent bid to Fingerhut.  Tr.  100.  Lee asserted VCC's intention of providing Spherenomics with a "finder's fee" of 5 percent of the first year's net revenue on the Fingerhut account if VCC got the contract.  Ex. 2.  Lee also informed Hoffman that VCC would likely have to bid at a rate lower than that proposed in the joint bid because other providers were still ostensibly in the hunt.  *Id.*  That same day, Spherenomics submitted a "Letter of Intent" to Fingerhut to service the Fingerhut account independently.  Ex. 32.

Fingerhut accepted the independent VCC bid in early 2003, and the terms of the two companies' agreement are memorialized in a "Letter of Intent" dated February 4, 2003.  Ex. 3; Coyle Dep. at 18.  Coyle testified that one reason Fingerhut accepted the VCC bid was the price term.  Coyle Dep. at 53.  The pricing schedule proposed rates considerably lower than those in the joint bid.  Ex. 3.  The rates per active agent hour ranged from $10 per hour for 801 or more total FTEs to $11.25 for 25-100 total FTEs.  *Id.*  VCC continuously provided call center services

to Fingerhut pursuant to this Letter of Intent through at least April 2005. Ex. 24 (invoices). VCC billed Fingerhut $3,794,240.60 for its services from May 1, 2003 through March 30, 2005. *Id.*

### 4. Was Spherenomics The Runner-Up?

Fingerhut received several bids for its long-term call center work. Deposition of Don Lynch dated August 10, 2004 ("Lynch Dep.") at 28-29. As discussed below, my conclusion that VCC breached its contractual obligations to Spherenomics by submitting its own bid for the Fingerhut account begs the question whether Spherenomics would have won the account had VCC honored its contractual obligations. The record on this score is inconclusive.

Both Bulle and Hoffman testified that they believed Spherenomics had a strong advantage as the incumbent provider, but their claim is undermined by the evidence of their strained relations with Smith. *See* Tr at 39-40 (Bulle testimony); *id*. at 123 (Hoffman testimony). The testimony of the Fingerhut witnesses is of little value. Don Lynch testified that a call service provider called Wipro was "definitely one of the top choices," and also that he believed Spherenomics was among the top choices for at least a portion of the work. Lynch Dep. at 28-30. Smith testified that Wipro was Fingerhut's second choice for its call center work, while Coyle testified that she didn't know who Fingerhut would have chosen if they had not gone with VCC. Deposition of Brian Smith dated August 9, 2004 ("Smith Dep.") at 45; Coyle Dep. at 105-106. I find that neither Smith's testimony nor Coyle's was credible. Smith's testimony about the bases of Fingerhut's dissatisfaction with Spherenomics and Tracmail finds no support in the documentary record, and is hard to reconcile with the fact that Smith invited both to participate in the bidding process. Smith Dep. at 45. Moreover, Smith also testified that, "we didn't reject bids, we accepted one." *Id.* Coyle's claimed lack of memory concerning the entire bidding

process suggests that overall she was an unreliable witness.  *See* Coyle Dep. at 24-25, 50, 53. Despite my unwillingness to credit the testimony of VCC's witnesses, however, it is Spherenomics' burden to prove that it would have won a long-term contract with Fingerhut but for VCC's breach, and I find that it has failed to sustain that burden.

For reasons explained below in my conclusions of law, Spherenomics' failure to prove this part of its case by a preponderance of the evidence is fatal to all of its claims.  I strongly suspect, however, that what Spherenomics has failed to prove is nevertheless true.  Viewed as a whole, the record suggests that Fingerhut was not trying to eliminate Spherenomics because it was a poor provider of call center services, but rather that it was trying to eliminate Spherenomics as a middleman whose services – and remuneration – would be unnecessary if only VCC could be released from its obligations under the No Solicitation Provision of the November Agreement.  If it is correct that VCC and Tracmail were the only call center providers in India in late 2002 that had experience with inbound retail calls, then it is easy to infer why Smith was so exercised when he called Bulle shortly after their meeting in Minnesota.  If Smith had come to realize that VCC and Tracmail were the *only* realistic candidates to handle Fingerhut's inbound retail calls, and if those two companies remained bound to work with Spherenomics, Smith would have realized that Fingerhut would have no choice but to pay a premium to a middleman for procuring the call center services it needed.  On the basis of that inference, I could further confidently infer that but for VCC's breach, Fingerhut would (however reluctantly) have awarded the contract to Spherenomics rather than to any other bidder.[1]  The

---

[1]  In this regard I note that VCC's assertion that Wipro would have obtained the contract rather than Spherenomics, Tr. 146, is at best debatable.  As Coyle testified, Fingerhut was looking for a "champion-challenger" model for its call center service providers.  Coyle Dep. at 15.  The record

chain of inferences is logical and compelling, and it does much to explain Bulle's credible testimony about his interactions with Fingerhut and VCC as well as the otherwise nonsensical and unpersuasive testimony of Smith, Coyle, and Lee. Unfortunately for Spherenomics, it does not suffice to support a finding of fact in its favor.

I do not reject the factual finding on the ground that it is legally unavailable as the product of drawing an inference from an inference – the Second Circuit has explicitly rejected that common-law rule. *See United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir.) *cert. denied*, 400 U.S. 834 (1970). Rather, I reject it because it rests on too sandy a foundation: Bulle's assertion that there were only two call center service providers in India that were sufficient to Fingerhut's needs may be unrebutted, but it is not based on any factual predicate in the record and thus seems insufficiently reliable as the basis for a verdict in Spherenomics' favor. Even if true, the proposition that Smith came to the same conclusion is entirely speculative – it does not rest on facts in the record, but on an assumption that Bulle's understanding was correct and that Smith somehow came to share it.

It may be that VCC and Fingerhut have made it impossible for Spherenomics to create a better record as to what might have happened in the absence of VCC's independent bid, but there is no evidence of such interference – again, only an inference based largely on intuition. Likewise, it may well be true that Fingerhut only rejected the Spherenomics bid because it knew

strongly suggests that Wipro was ultimately chosen as the "challenger" – which is entirely consistent with a *different* company being likely to be chosen for the "champion" role. First, the testimony is unrebutted that Wipro, while a large call-service provider, was not one of the only two Indian call center service providers that had experience in inbound retail calls at the time the Fingerhut account was up for bidding. Tr. 23. Second, Wipro did not provide any services for Fingerhut until August 2003 (and even then provided only "some" of Fingerhut's call center service). Stip. 18.

that VCC was going to bid independently of Spherenomics at a more competitive rate, but to leap from that premise (itself a matter of inference) to the conclusion that Spherenomics would have won the account but for VCC's breach requires multiple levels of speculation. In short, my finding of fact in this regard (or more precisely, my finding that Spherenomics has failed to prove a critical fact) is based not on an interpretation of law but on my inability to say in good conscience that Spherenomics has proved that which I strongly suspect to be true.

      D.     The Value Of The Fingerhut Account

From May 1, 2003 through March 30, 2004, VCC billed Fingerhut $3,794,240.60 for the provision of call center services. Ex. 24. Spherenomics claims that Spherenomics made profits of approximately $1,185,089.60 from these revenues, and has submitted certain of VCC's financial records in support of this assertion. DE 88 at 10; Exs. 23-24. As discussed below, evidence of VCC's profits is irrelevant to the purpose for which it was offered; namely, as evidence of Spherenomics' lost profits. Thus, rather than parse through the exhibits, which were admitted without any explanatory testimony, I decline to make a finding of fact as to VCC's profits on the work it performed for Fingerhut.[2]

---

[2] Before trial, VCC moved *in limine* to preclude what VCC described as speculative evidence of Spherenomics' lost profits, including the opinion testimony of Spherenomics' damages expert, John G. Troiano. DE 80. Spherenomics later withdrew its proffer of Troiano's testimony. DE 84. To the extent VCC's motion remained a live controversy after Troiano's withdrawal, it is necessarily mooted by the instant decision, in that I resolve all of Spherenomics' claims without making any finding of fact as to either the profits that Spherenomics lost or those that VCC realized as the result of its misconduct. I further note that I have disregarded those portions of Spherenomics' post-trial submissions that improperly relied on certain of its financial records that were never admitted into evidence. *See* DE 88 at 12-13 (citing Ex. 22); DE 90; DE 91.

II.    Conclusions of Law

    A.    Jurisdiction and Choice of Law

    The parties are citizens of different states (Spherenomics is incorporated in New York;

VCC in the State of Washington) and the amount in controversy exceeds $75,000.  Amended

Complaint.  Subject matter jurisdiction therefore exists pursuant to 28 U.S.C. § 1332.

    The agreement at issue does not contain a choice of law provision, but the parties'

submissions suggest their agreement that New York law applies to the instant dispute.  *See* DE

88; DE 89.  Because choice of law rules are substantive in nature, in a diversity case such as this,

the forum state's choice of law rules apply.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S.

487, 496-497 (1941).  New York applies an "interest analysis" to choice of law issues in cases

sounding in contract law: "the law of the jurisdiction having the greatest interest in the litigation

controls."  *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137

(2d Cir. 1991) (citation and internal quotation omitted).  In determining which jurisdiction has

the greatest interest, courts typically consider where a contract was negotiated, executed, and

performed; and also where the parties reside, do business, or are domiciled or incorporated.  *Id.*

    In this case, the contract-oriented factors offer little guidance.  The agreement appears to

have been negotiated by telephone and executed by electronic means in Spherenomics' New York

office and VCC's Seattle office.  *See* Ex. 1.  Performance of the contract was to occur primarily

in New Delhi, India at VCC's call centers, and the provision of these services was the subject

matter of the agreement.  *Id.*  As to the party-oriented factors, I note that Spherenomics is

incorporated in New York, and that the judge to whom this case was previously assigned found

that VCC conducts sufficient business in New York to make personal jurisdiction appropriate.

16

*See* DE 18.  Based on the foregoing, and the parties' reliance on New York law in their submissions, I will apply New York law.

B.    Counts One And Two:  Breach of Contract

A claim for breach of contract under New York law consists of the following four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) defendant's breach of that contract; and (4) resulting damages to the plaintiff.  *See Minuteman Press Int'l v. Matthews*, 232 F. Supp.2d 11, 14 (E.D.N.Y. 2002).

Spherenomics claims that its November Agreement with VCC was a valid contract, and that the contract's No Solicitation Provision, as well as the covenant of good faith and fair dealing that is deemed to be a part of every contract, precluded VCC from soliciting business from Fingerhut for two years after it ceased to provide such services as Spherenomics' subcontractor.  If further contends that VCC blatantly breached the November Agreement when it submitted an independent bid for, and was awarded, Fingerhut's long-term call service work, and that this breach caused it to lose substantial profits and precipitated its demise as a business. DE 82 at 2-3.

VCC argues that the November Agreement is unenforceable because the parties intended to be bound to its material term – the No Solicitation Provision – only after the execution of a subsequent agreement.  DE 89 at 13-14.  VCC further argues that even if the November Agreement was an enforceable contract, Spherenomics' claim must fail because it has not shown that it suffered any damages as a result of the alleged breach.  *Id.* at 18-20.  Finally, VCC also claims that Spherenomics has failed to introduce any relevant evidence as to its purported lost profits.  *Id*.  I address each point in turn below (save for the element of performance by

17

Spherenomics, which VCC does not contest and which I therefore conclude has been established).

1.     The November Agreement Was An Enforceable Contract

Spherenomics argues that the terms of the November Agreement, including those of the No Solicitation Provision, are unambiguous, and the mere fact that the parties intended to execute a subsequent agreement with respect to VCC's non-disclosure and non-solicitation obligations concerning Fingerhut does not render those clear terms invalid. DE 88 at 11. Spherenomics further argues that VCC's conduct demonstrated its clear understanding of the effect of No Solicitation Agreement. *Id.* at 12. In particular, VCC notes that Lee asked several times for VCC to be released from the provision, and that he never disputed the meaning or validity of the term on the several occasions when Spherenomics reminded him of it. *Id.*

VCC argues that the fact that the parties intended a later agreement concerning disclosure of information and solicitation of clients evinces a lack of meeting of the minds with respect to this material term that renders the entire agreement an unenforceable "agreement to agree." DE 89 at 13. VCC further argues that the substance of this term counsels against its enforceability, noting that courts generally disfavor non-compete clauses. DE 89 at 14.

"[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained." *Martin v. Schumacher,* 52 N.Y.2d 105, 109 (1981). It is axiomatic therefore that "a mere agreement to agree, in which a material term is left open for future negotiations, is unenforceable." *Id.* (citations omitted). "Where an agreement contains open terms, calls for future approval, and expressly anticipates future preparation and execution of contract documents, there is a strong presumption against

finding a binding and enforceable obligation." *Carmon v. Soleh Boneh*, 614 N.Y.S.2d 555, 555 (N.Y. App. Div. 1994); *see Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074 (2d Cir. 1990) (finding letter with the preface "Will be in touch . . . to draw up final papers next week" unenforceable agreement to agree). By contrast, even without a formal document, a binding contract exists where "the parties have settled on the contract's substantial terms." *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 574 (2d Cir. 1993) (citations omitted). The critical inquiry therefore is whether the parties have settled on the "substantial terms" of the contract.

I conclude that the November Agreement was an enforceable, unambiguous statement of those terms to which the parties had agreed to as of November 25, 2002. Contrary to VCC's assertions, the four corners of the November Agreement plainly evince the parties' contemporaneous intent to be bound. The November Agreement does not contain any open terms, and there is no indication that the parties' intended that the general terms of their arrangement with regard to Fingerhut would be subject to a subsequent agreement: "[T]hese are the terms, as we understand them . . . . If . . . you are in agreement, then let's both of us sign this document so we can get a quick start." November Agreement at 1. That Lee subsequently signed the agreement suggests that he concurred that the agreement contained the terms of the parties' transaction. The agreement was precisely what it purported to be: a statement of those material terms that the parties had agreed upon as the basis for moving forward, at least for a short time, with their business relationship; it was not merely an agreement to agree.

Moreover, I disagree with VCC that there was any lack of "meeting of the minds" with respect to any material provision in the contract. DE 89 at 13. The plain text of the No

Solicitation Provision suggests that the parties intended for it to take immediate effect. A contract term that has "'a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion'" is by law unambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc*. 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Insurance Company of North America,* 46 N.Y.2d 351, 355 (1978)). In contrast, an ambiguous term is one that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person." *See Care Travel Co., Ltd. v. Pan American World Airways, Inc*., 944 F.2d 983, 988 (2d Cir. 1991) (citations and quotations omitted). The meaning of the No Solicitation Provision is susceptible to only one interpretation: VCC agreed not to solicit work directly from Fingerhut for two years after the end of any contract with Spherenomics regarding its provision of call center services to that Spherenomics client. The November Agreement therefore is not ambiguous, and as a result, I need not and must not look beyond its four corners to interpret it. *See Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract.").

The parties' commitment to enter into a "mutually agreeable" and presumably more detailed NDA is, to be sure, a mere agreement to agree. Spherenomics could not rely on that term either to compel VCC to execute Spherenomics' standard NDA or to enforce its terms. *See Martin v. Shumacker*, 52 N.Y.2d at 105 (renewal provision providing for annual rentals "to be agreed upon" unenforceable agreement to agree). But the parties' agreement to agree on a future NDA has no effect on the unambiguous terms to which the parties did agree, and it certainly does

not render the entire document an unenforceable agreement to agree. *See Jim Bouton Corp.*, 902

F.2d at 1076; *Carmon*, 614 N.Y.S.2d at 555.

To the extent that VCC asserts that the No Solicitation Provision is unenforceable

because it is an unreasonable restriction against competition – an assertion that VCC did not

make explicit either at trial or in its post-trial submissions – I disagree.  Under New York law, a

restrictive covenant is reasonable "if not excessive 'as to time, scope and area and is not unduly

burdensome.'"  *Baker's Aid v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1215 (E.D.N.Y.

1990) (quoting *Meteor Indus. v. Metalloy Indus.,* 539 N.Y.S.2d 972, 974 (N.Y. App. Div. 1989)).

The reasonableness and thus the enforceability of such a covenant depends in part on the context

in which the promise was made.  *See DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37

F. Supp.2d 192, 196 (E.D.N.Y. 1999).  The two primary contexts in which such covenants appear

are contracts for the sale of a business and employment contracts.  In the former context, they are

"routinely enforced," while in the latter they are viewed with suspicion and "enforced only to

protect an employer from unfair competition."  *Id.* at 196-197 (citing cases).  The instant case

involves an ordinary commercial contract that concerns neither the sale of a business nor an

employment relationship.  As such, it falls in a considerably less common, third category of cases

involving competition-restricting covenants, the reasonableness of which is assessed by "a simple

rule of reason, balancing the competing public policies in favor of robust competition and

freedom to contract."  *Id.* at 197.  At issue under such an analysis are the legitimate business

interests to be served by the covenant, the reasonableness of the geographic scope and temporal

duration of the restriction, and the hardship enforcement would impose.  *Id.* (citing *American*

*Inst. of Chem. Eng'rs v. Reber-Friel Co.,* 682 F.2d 382, 387 (2d Cir. 1982)).

In the instant case, the legitimate business interest to be preserved is the unfair competition that would result from VCC independently pursuing business opportunities with a client to whom Spherenomics had introduced it for the purpose of the joint pursuit. *See id.* at 199 ("know-how, *client base*, ... and good will" are interests that "warrant some protection through restrictive covenants") (emphasis added). The restriction at issue is unquestionably related to this specific interest: its effect is to prevent VCC from independently soliciting business from the specific client to whom Spherenomics introduced it.

The reasonableness of the provision must be assessed in light of the fact that it was "negotiated by sophisticated businessman." *Id.* VCC has never argued that it was coerced into agreeing to this covenant or that it "lacked any meaningful choice" with regard to accepting it. *Id.* at 200. Moreover, there is nothing to suggest any hardship to VCC. VCC was not barred outright from dealing with Fingerhut, it merely had to conduct all of its business with Fingerhut through Spherenomics for a specified period of time. The duration of the term at issue (two years) relative to the duration of the agreement in which it appeared (three weeks), might be problematic in the context of an employment contract, but this was an arm's-length transaction between knowledgeable parties. At the time of contracting, both parties expected that the agreement would lead to a long-term business relationship between them and their mutual client Fingerhut. Those who negotiated on VCC's behalf were sophisticated business people who knew the risk that this would not in fact come to fruition. Despite this risk, it undertook the terms of the parties' short-term agreement in the interest both of securing the short-term Fingerhut work and of pursuing a long-term relationship with Spherenomics regarding that client. Based on the foregoing, I find that the provision at issue created a reasonable restriction.

2. VCC Breached The November Agreement's No Solicitation Provision

The record plainly establishes that VCC breached the No Solicitation Provision. It solicited the long-term Fingerhut contract independently of Spherenomics and provided call center services to Fingerhut continuously during the 24-month period covered by the no-solicitation term. Such acts directly violate the plain terms of the parties' binding and legally enforceable agreement, and therefore suffice to establish the third element of Spherenomics' claim under Count One.

Spherenomics argues that the same facts also establish the third element under Count Two, in which it claims that VCC violated the implied covenant of good faith and fair dealing that inheres in every contract. DE 90 at 16. That argument is flawed: a claim asserting breach of the implied covenant that is merely duplicative of a claim predicated on the breach of an explicit contractual provision does not offer an independent basis for recovery. *See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir. 1992); *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."). Accordingly, Spherenomics cannot prevail on its second count, and I do not address it further in this analysis.

3. Spherenomics Has Not Proved Resulting Damages

Spherenomics asserts that its damages resulting from VCC's breach can be ascertained from the evidence in the record about VCC's revenues from its work for Fingerhut during the two-year period at issue, VCC's profits, and the commission rates to which VCC and

Spherenomics agreed in making the joint bid that Fingerhut rejected. *See* DE 88 at 12-16. VCC counters that Spherenomics has failed to demonstrate that it would have been awarded any of the long-term Fingerhut work in the absence of VCC's breach, and thus has failed to meet its burden of proof with regard to damages. VCC further argues that even if Spherenomics was somehow damaged by its conduct, Spherenomics has failed to present any relevant evidence that proves its actual losses. That is, VCC argues that the evidence about its own profits and the amounts it billed Fingerhut are irrelevant to a determination of what Spherenomics' losses were, and that the rejected joint bid says nothing meaningful about damages. VCC adds that Spherenomics has adduced no evidence about the damages the parties contemplated when they executed their contract. *See* DE 89 at 18-20. As explained below, I agree with VCC on this score.

Under well-settled New York law, a plaintiff who proves a breach of contract may recover lost profits contract only by showing: (1) that the damages were caused by the defendant's breach; (2) that the lost-profit damages are "capable of proof with reasonable certainty"; and (3) that such damages were "fairly within the contemplation of the parties to the contract at the time it was made." *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261 (1986) ("*Kenford I*") (citing *Witherbee v. Meyer,* 155 N.Y. 446 (1898)). The profits claimed to have been lost by reason of the defendant's breach may not be "speculative, possible, . . . imaginary[,] . . . remote[,] or the result of other intervening causes." *Id.*; *Kenford Co., Inc. v. County of Erie,* 73 N.Y.2d 312, 319 (1989) ("*Kenford II*"). Instead, they must be directly traceable to the breach. *Id.* On the record before me, I am compelled to find that Spherenomics' assertion of lost profits as a result of VCC's bid is too speculative to allow it to recover.

I agree with VCC that Spherenomics has failed to meet its burden of proof with regard to the causative element of its theory of damages. Spherenomics' theory of damages relies on a chain of inferences concerning its advantage as an incumbent that, as explained above in my findings of fact, the record does not support. DE 88 at 15-16. I am therefore compelled to find that Spherenomics has failed to demonstrate that it suffered any damages, including the lost profits it claims, as a result of VCC's breach. *Cf. Support Systems Associates, Inc. v. Tavolacci*, 522 N.Y.S.2d 604, 606 (N.Y. App. Div. 1987) (defendant conceded that the sole reason the plaintiff was not awarded the business at issue was the defendant's breach of a competition-restricting covenant in employment contract).

In my findings of fact, I noted the possibility that VCC's conduct, as well as Fingerhut's, has contributed to Spherenomics' inability to prove that it would have won the Fingerhut account but for VCC's breach. Even if I could make such a finding – which the record does not sufficiently support – it would not excuse Spherenomics' inability to establish causation. It is true that Spherenomics would be held to a less exacting standard as to the *amount* of damages if it could show that VCC's conduct prevented a more accurate calculation. *See W.L. Hailey & Co. v. Niagara County*, 388 F.2d 746, 753 (2d Cir. 1967); *Lexington Products Limited v. B.D. Communications, Inc.,* 677 F.2d 251, 253 ("A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain."). But Spherenomics has cited no case, and I have found none, that applies the same principle to excuse a plaintiff's failure to show the *causation* of damages.

Although Spherenomics' inability to prove that it would have won the Fingerhut account is fatal to its damages claim, it is not the sole basis for my conclusion that it may not recover the

damages it seeks. Lost profits need not be measured with absolute uncertainty or mathematical precision, but they must be susceptible to measurement based on known reliable factors without undue speculation. *Ashland Mgm't Inc. v. Janien*, 82 N.Y.2d 395, 405-406 (1993). The evidence before me concerning damages consists of: (1) invoices that establish the revenues that VCC derived from its work for Fingerhut during the relevant time period; (2) VCC's financial records, from which I could estimate its profits based on the evidence of its revenues; (3) evidence of the commission that VCC would have received under the joint bid with Spherenomics that Fingerhut rejected; and (4) the pricing schedules for both the unsuccessful joint bid and VCC's successful independent bid. From this evidence I could likely calculate VCC's profit on the Fingerhut account. But without any evidence that Spherenomics would have realized the same profits – and the record contains no such evidence – I could not use VCC's profits as a proxy for estimating those that Spherenomics might have realized in the absence of a breach. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir. 1992); *United States Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) (damages award based on defendant's profits only appropriate where "those profits tend to define the plaintiff's loss"). Likewise, using VCC's revenues from the Fingerhut account and the commission the parties agreed to in the joint bid, I could reasonably calculate the gross amount that Spherenomics stood to gain on the contract. However, absent evidence of what the commensurate costs of performance would have been to Spherenomics, there is no way to calculate what its *profits* would have been. *See Kenford I*, 67 N.Y.2d at 262; *Allard v. Arthur Andersen & Co.,* 924 F. Supp. 488, 493-494 (S.D.N.Y.1996) (award of lost profits requires reliable evidence of what the plaintiff's net income would have been).

Nor does the record permit me to conclude that Spherenomics succeeded in proving that lost-profit damages were "fairly within the contemplation of the parties to the contract at the time it was made." *Kenford I*, 67 N.Y.2d at 261.  The November Agreement that VCC breached, unlike the more explicit NDA that it never executed, is silent with respect to the parties' contemplation regarding damages.  Spherenomics has introduced no evidence beyond that silent contract from which I could conclude that the parties intended to indemnify Spherenomics for its lost profits in the event that the fox, having gained admission to the hen house, acted like a fox.

C.    The Equitable Claims

Spherenomics' Amended Complaint raises two separate equitable claims against VCC: promissory estoppel and unjust enrichment.  Its theory with regard to the first of these claims is that VCC made a clear and unambiguous promise not to solicit or accept business from Fingerhut, and that Spherenomics reasonably and foreseeably relied on this promise to its own severe detriment since VCC undercut it in the bidding process for the long-term work.  Its theory on the second claim is that VCC has been unjustly enriched by earning profits from its work for Fingerhut – work that it secured only by unfairly exploiting the opportunity and information it gained from Spherenomics.  *See* DE 88 at 17-19.

The gravamen of both equitable claims is that VCC wrongfully profited from its solicitation of call center work from Fingerhut.  Because this is essentially the same theory as its breach of contract claim, and because I have found that there was a valid express contract concerning VCC's obligation in this regard, both equitable claims must fail.  Promissory estoppel and unjust enrichment are quasi-contractual remedies that are inapposite when there is a "a valid and enforceable written contract governing a particular subject matter." *Clark-Fitzpatrick, Inc. v.*

27

*Long Island Rail Road Co.,* 70 N.Y.2d 382, 388-389 (1987).  The latter rule applies even where, as here, the parties' contract fails to provide the non-breaching party with a remedy for the clearly-established breach of the contractual right at issue.

Had the agreement not contained a provision regarding solicitation of business from Fingerhut, I could properly have considered the propriety of an equitable remedy.  *See Sternberg, Inc. v. Walber 36th Street Associates*, 187 A.D.2d 225 (N.Y. App. Div. 1993).  While this rule appears to create an anomalous result, I note that in this case it does not create an injustice, or at least no injustice independent of that created by the circumstances of this case.  Spherenomics' failure to prove causation with regard to contractual damages would likewise preclude recovery on either of the equitable claims.

To prevail on a claim of promissory estoppel a plaintiff must show that she suffered harm as a result of her reasonable, foreseeable reliance on the defendant's promise.  *See R. Freedman & Son, Inc. v. A.I. Credit Corp.*, 641 N.Y.S.2d 429, 430 (N.Y. App. Div. 1996) (party advancing claim of promissory estoppel "must demonstrate that the opposing party made a clear and unambiguous promise, upon which the former reasonably relied, to its detriment").  Recovery on a claim of unjust enrichment requires a showing that:  (1) the defendant was enriched; (2) at the plaintiff's expense; and (3) under the circumstances it would be unjust not to compensate the plaintiff.  *See R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir. 1997).  Because Spherenomics cannot show that it would otherwise have secured the Fingerhut account, it has failed to establish that it was actually harmed by VCC's broken promise.  The lack of evidence on this score prevents it from recovering for VCC's clear breach of this promise, whether the promise is framed as a contractual one or an equitable one.

III.    Conclusion

For the reasons set forth above, I am constrained to award judgment to defendant VCC on all of the claims against it asserted by plaintiff Spherenomics in the Amended Complaint. I therefore respectfully direct the Clerk to enter judgment in favor of the defendant and thereafter to close this case.

**SO ORDERED.**

Dated:  Brooklyn, New York
        March 31, 2006

                                        /s/ James Orenstein
                                        JAMES ORENSTEIN
                                        U.S. Magistrate Judge